## Commonwealth v. Paglianete

*Howard R. Berninger*, District Attorney, for Commonwealth.

*John M. Kuchka*, for defendant.

KREISHER, P. J., August 16, 1965.—The above-captioned defendant was arrested for shooting at and killing a rabbit within 150 yards of farm buildings in Mifflin Township, this county. The area was designed as a wildlife safety zone with signs posted and the al-

leged violation was observed by a deputy game warden. Defendant was adjudged guilty by the justice of the peace after a full hearing and the matter is now before this court on appeal. After a hearing de novo, the testimony having been transcribed and filed, counsel requested argument; however, since the case was heard December 21, 1964, and the case was never ruled for argument, we conclude the court is justified in disposing of the matter without the benefit of argument.

Defendant admits the physical facts as testified to by the officer, but contends his act does not fall within the provisions of the statute making it unlawful to shoot within 150 yards of buildings, because he contends his act falls within the exception set forth in the statute which makes it permissible to hunt within a safety zone with "the specific advance permission of the owner or tenant thereof": Act of May 31, 1947, P. L. 386, sec. 2, 34 PS §1311.808.

Therefore, the outcome of this appeal depends upon whether or not defendant was granted "specific advance permission of the owner" to shoot within the safety zone, and, to resolve this question, the testimony of the parties is all important.

The landowner testified:

"He asked for permission to hunt, and I told him anywhere up in the fields, but not around the buildings. I definitely mentioned the buildings.

"Q. Was he on your land; did he come to your house and ask for permission?

"A. I was going up to my shop for some tools, and the man was there by the building.

"Q. Did he come over to you, or did you go over to him when you first saw him?

"A. Well, I was going right straight toward him; I think I was as close from him as I am to you, but I was in a hurry; I didn't hardly talk to him at all. I just told him where he could hunt; that is all."

Defendant is a member of the bar of an adjoining county with 18 years hunting experience, but this was his first hunting trip in this particular area. He testified as follows:

"Q. Tell us what happened on the morning of this alleged violation?

"A. Well, as I was driving down this county road, the road that was described before, I saw a ringneck fly across the road. I stopped my car and took the gun out. It was unloaded then. I walked into the woods to see where the bird had gone. As I approached the top of the hill, I saw a safety zone sign. I didn't find the bird or see where it had gone. I then walked down toward Mr. Peterman's home. As I approached his barn and the driveway there, he was going to his car, and I asked him if I could hunt.

"Q. What did he say?

"A. Mr. Peterman said to me, 'Don't hunt around the buildings; hunt in the fields.'

"Q. Then what did you do after that?

"A. I walked up toward the field, loaded my gun and proceeded to hunt."

On page 19 of the notes of testimony, it is stated:

"Q. What was said?

"A. He indicated after a while that I was hunting in a safety zone. I said I wasn't sure where I shot from.

"Q. Did you think at that time you may have been more than 150 yards from the building?

"A. I wasn't sure at that time.

"Q. What else was said?

"A. I said that I had permission to hunt there, and he said that he was going to have to talk to his supervisor. We then got in his car and went to see Mr. Sherlinski.

"Q. Did you go along with him?

"A. Yes, I did.

"Q. There has been some testimony here concern-

ing distances, tell me were the shells where you shot the gun from?

"A. No, they were not.

"Q. How do you explain that?

"A. After I shot the two shots at the rabbit, I hit him on the second one, I walked up to the rabbit, and I ejected the shells fairly close to him. I told Mr. Sherlinski and Mr. Edwards that at the time.

"Q. Were either of the game officers concerned about determining whether Mr. Peterman had given you permission to hunt there?

"A. When I told Mr. Edwards that I had permission, he said that it was none of his business.

"Q. How long have you been hunting?

"A. Eighteen years.

"Q. Have you ever violated any of the game laws before?

"A. No, sir.

"Q. Were you under the impression that Mr. Peterman's permission was sufficient to allow you to hunt in this area?

"A. Yes, sir, I was because there is not that much land there. I have since had a chance to measure it, and from the shed out to the tree line, it is 178 yards.

"Q. That tree line you assumed was the boundary line of Mr. Peterman's property, right?

"A. There were signs posted there indicating a safety zone beyond that, I imagine, toward the highway.

"Q. Now, the area in which this shot was taken, you are no longer suggesting that it was not within the safety zone?

"A. No, I am not; I admit that it was within the safety zone."

As a general rule, words used in a statute are to be given their ordinary use and meaning. "Specific advance permission" needs little interpretation in these

circumstances. We think "specific" as used here is synonymous with "special" or "explicit"; that "advance" means "in front of" or "beforehand" and that "permission" means "authorization" or "formal consent" to do a particular thing.

From the above-quoted testimony, it must be obvious defendant was not granted "specific advance permission" by the owner of the land to shoot within a safety zone. It seems superfluous to state defendant violated said act of assembly; however, we are unable to constrain our observation as to the ill-chosen time to take that chance, with a deputy warden parked so close at hand.

ORDER OF COURT

And now, August 16, 1965, the appeal in the above-captioned case is dismissed at appellant's cost. Exception noted.